**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

......................................................................

**ALLSTATE INSURANCE CO.,** *et al.*,

                         **Plaintiffs,**

        -against-

**SHMUEL BATUROV,** *et al.*,

                       **Defendants.**

......................................................................

**21-CV-02967 (BMC)**


## MEMORANDUM OF LAW ADDRESSING THE COURT'S MAY 26, 2021 ORDER TO SHOW CAUSE WHY THE COMPLAINT SHOULD NOT BE DISMISSED FOR IMPROPER JOINDER


**MORRISON MAHONEY, LLP**
**WALL STREET PLAZA**
**88 PINE STREET, SUITE 1900**
**NEW YORK, NEW YORK 10005**
**TELEPHONE: (212) 825-1212**

**CADWALADER, WICKERSHAM & TAFT LLP**
**ONE WORLD FINANCIAL CENTER**
**NEW YORK, NEW YORK 10281**
**TELEPHONE: (212) 504-6361**

**ATTORNEYS FOR PLAINTIFFS**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ...................................................................................................................... 8

   I.  THE COMPLAINT'S CLAIMS FOR RELIEF ARE LOGICALLY CONNECTED ......... 8

      1. Legal Standard ........................................................................................................ 8

      2. The Complaint's Claims For Relief Are Logically Connected ..................................... 10

   II.  JOINDER IS APPROPRIATE IN THE INTERESTS OF JUDICIAL ECONOMY ......... 18

   III. SEVERANCE SHOULD NOT BE IMPOSED AT THIS EARLY STAGE OF
      THE LITIGATION ..................................................................................................... 19

CONCLUSION ................................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Am. Transit Ins. Co. v. Bilyk*, 19-CV-5171 (BMC), 2021 WL 216673
　(E.D.N.Y. Jan. 21, 2021) ................................................................................. 2, 3, 6, 19

*Beth Israel Medical Ctr. v. Goodman*, 12-CV-1689 (AJN), 2013 WL 1248622
　(S.D.N.Y. Mar. 26, 2013) ............................................................................................. 21

*Blesedell v. Mobil Oil Co.*, 708 F. Supp. 1408 (S.D.N.Y. 1989) ................................................ 8, 9

*City of New York v Joseph L. Balkan, Inc.*, 656 F. Supp. 536 (E.D.N.Y. 1987) ........................... 8

*Fong v. Rego Park Nursing Home*, 95-CV-4445 (SJ), 1996 WL 468660
　(E.D.N.Y. Aug. 7, 1996) ............................................................................................... 8

*Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821 (S.D.N.Y. 2008) ......... 10

*Liegey v. Ellen Figg, Inc.*, 02-CV-1492 (JSM) (JCF), 2003 WL 21361724
　(S.D.N.Y. June 11, 2003) ............................................................................................. 9

*Lyons v. Litton Loan Servicing LP*, 13-CV-513 (ALC) (GWG), 2014 WL 5039458
　(S.D.N.Y. Sept. 29, 2014) ........................................................................................... 20

*Mosley v. General Motors Corp.*, 497 F.2d 1330 (8th Cir. 1974) ................................................ 9

*Saval v. BL Ltd.,* 710 F.2d 1027 (4th Cir.1983) ........................................................................... 8

Sonn v. Wal–Mart Stores, Inc., 06-CV-1816 (FB) (JO), 2006 WL 2546545
　(S.D.N.Y. Sept. 1, 2006) .............................................................................................. 9

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966) ....................................................... 9

*United States v. Aquavella,* 615 F.2d 12 (2d Cir.1979) ............................................................... 9

*Viada v. Osaka Health Spa, Inc.*, 235 F.R.D. 55 (S.D.N.Y. 2006) ........................................ 10, 20


<u>Rules</u>

Fed. R. Civ. P. 20 ................................................................................................................ passim

<u>Other Authorities</u>

Amended Complaint, *Allstate Ins. Co. v. Abramov*, 16-CV-1465 (AMD) (SJB),
    ECF No. 5 (E.D.N.Y. May 9, 2016) ............................................................................. 2

Amended Complaint, *Allstate Ins. Co. v. Amirova*, 19-CV-2354 (EK) (LB),
    ECF No. 109 (E.D.N.Y. Aug. 12, 2019) ..................................................................... 2

Amended Complaint, *Allstate Ins. Co. v. Avetisyan*, 17-CV-4275 (LDH) (RML),
    ECF No. 157 (E.D.N.Y. May 9, 2019) ....................................................................... 2

Amended Complaint, *Allstate Ins. Co. v. Khaimov,* 11-CV-2391 (MKB) (JMA),
    ECF No. 10 (Aug. 3, 2011) ............................................................................... 17, 18

Amended Complaint, *Allstate Ins. Co. v. Yadgarov*, 11-CV-6187 (PKC) (VMS),
    ECF No. 248 (E.D.N.Y. Oct. 17, 2013) ..................................................................... 2

Complaint, *Allstate Ins. Co. v. Abayev*, 20-CV-3302 (WFK) (RER), ECF No. 1
    (E.D.N.Y. Jul. 23, 2020) ............................................................................................ 2

Complaint, *Allstate Ins. Co. v. Abutova*, 13-CV-3494 (ARR) (LB), ECF No. 1
    (E.D.N.Y. June 20, 2013) .......................................................................................... 2

Complaint, *Allstate Ins. Co. v. Afanasyev*, 12-CV-2423 (JBW) (CLP), ECF No. 1
    (E.D.N.Y. May 16, 2012) ........................................................................................... 2

Hr'g. Tr., *Allstate Ins. Co., et al. v. Khaimov et. al*, 11-CV-2391 (JG) (JMA)
    (E.D.N.Y. Feb. 16, 2012) ..................................................................................... 1, 18

## INTRODUCTION

Plaintiffs Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company (alternatively referred to herein as  "Allstate" and "Plaintiffs") respectfully submit this Memorandum of Law addressing the Court's May 26, 2021 Order to Show Cause why the Complaint should not be dismissed for improper joinder. For the reasons set forth below, it is respectfully submitted that Defendants are properly joined and that a dismissal or severance at this time would create significant avoidable inefficiencies.[1]

## PRELIMINARY STATEMENT

Over the past decade, Plaintiffs have litigated many No-fault Durable Medical Equipment ("DME") matters in this District which, like this matter, alleged that various groups of defendants participated in separate but strikingly parallel schemes to defraud in which they adopted and implemented the same fraudulent blueprint to submit bogus No-fault claims to Plaintiffs for reimbursement. Included in those matters is *Allstate Ins. Co., et al. v. Khaimov et. al*, 11-CV-2391 (JG) (JMA) (E.D.N.Y.), a case in which the very issue of joinder was fully briefed, and in which Judge Gleeson held that the separate DME defendants were properly joined because, among other things, the "complex schemes [ ] alleged [were] generally identical, [thus,] they're clearly logically related" and there would be "nothing but efficiency in keeping [the claims] together in [one] case." Hr'g. Tr. at 49:19-21, 50:2-3, *Allstate Ins. Co., et al. v. Khaimov et. al*, 11-CV-2391 (JG) (JMA) (E.D.N.Y. Feb. 16, 2012) (Marvin Decl. Exhibit A). In the nine years since the *Khaimov* decision, no contrary authority has been issued with respect to any similar case filed by Plaintiffs, including

---

[1] Accompanying this memorandum is the Declaration of Daniel S. Marvin, dated June 2, 2021 ("Marvin Decl.").

those that had upwards of twice as many defendants as this case.[2]  The current Complaint herein, similar in form, should be permitted to proceed as filed.

The Court's Order to Show Cause refers to the decision in *Am. Transit Ins. Co. v. Bilyk*, 19-CV-5171 (BMC), 2021 WL 216673, at *5 (E.D.N.Y. Jan. 21, 2021) (hereinafter referred to as "*Bilyk*"), a case involving a different insurer in which Your Honor, *sua sponte*, determined that the Plaintiff in that case "did not bother to explain specifically what each [defendant] was alleged to have done" and therefore did not establish that the claims alleged were transactionally related.  The Court also suggested that the Plaintiff therein was seeking to avoid incurring multiple filing fees. *Id*. at 5-6.

Here, however, the very form of Plaintiffs' Complaint had been previously upheld by numerous decisions within the Second Circuit.  Plaintiffs filed the Complaint herein guided by their reasonable and rational belief that the Complaint was legally sound both in form and substance and supported – as in many previous cases -- the joinder of Defendants engaging in separate, but logically related fraudulent schemes employing the same fraudulent blueprint. The Complaint herein (and this Response) detail the parallel schemes and identify how each Defendant

---

[2]  *See, e.g.,* Complaint, *Allstate Ins. Co. v. Abayev*, 20-CV-3302 (WFK) (RER), ECF No. 1 (E.D.N.Y. Jul. 23, 2020) (naming 58 defendants and alleging 28 separate but similarly implemented fraudulent schemes); Amended Complaint, *Allstate Ins. Co. v. Amirova*, 19-CV-2354 (EK) (LB), ECF No. 109 (E.D.N.Y. Aug. 12, 2019) (naming 53 defendants and alleging 26 separate but similarly implemented fraudulent schemes); Amended Complaint, *Allstate Ins. Co. v. Avetisyan*, 17-CV-4275 (LDH) (RML), ECF No. 157 (E.D.N.Y. May 9, 2019) (naming 50 defendants and alleging 23 separate but similarly implemented fraudulent schemes); Amended Complaint, *Allstate Ins. Co. v. Abramov*, 16-CV-1465 (AMD) (SJB), ECF No. 5 (E.D.N.Y. May 9, 2016) (naming 88 defendants and alleging 38 separate but similarly implemented fraudulent schemes); Complaint, *Allstate Ins. Co. v. Abutova*, 13-CV-3494 (ARR) (LB), ECF No. 1 (E.D.N.Y. June 20, 2013) (naming 80 defendants and alleging 31 separate but similarly implemented fraudulent schemes); Complaint, *Allstate Ins. Co. v. Afanasyev*, 12-CV-2423 (JBW) (CLP), ECF No. 1 (E.D.N.Y. May 16, 2012) (naming 111 defendants and alleging 41 separate but similarly implemented fraudulent schemes); Amended Complaint, *Allstate Ins. Co. v. Yadgarov*, 11-CV-6187 (PKC) (VMS), ECF No. 248 (E.D.N.Y. Oct. 17, 2013) (naming 84 defendants and alleging 30 separate but similarly implemented fraudulent schemes).

was involved in the implementation of the parallel schemes.[3] Moreover, to the extent that the Court might suggest that the inclusion of all Defendants in the Complaint was guided by some other factor, such as the avoidance of filing fees, *see Bilyk,* 2021 WL 216673 at *5, that is assuredly not the case. Having been defrauded by Defendants out of over $3 million, and with another $4 million in fraudulently billed claims at issue, coupled with the significant legal expenses incurred by Plaintiffs in drafting the complaint, the payment of additional filing fees would be insignificant in relation to the matters at issue and, in any event, can be imposed here without Allstate objection should the Court so determine the need.[4]

In issuing its Order to Show Case, the Court stated that Plaintiffs' allegations that defendants "engaged in separate, but fundamentally similar schemes…demonstrate that plaintiffs' claims against the different defendants are not transactionally related," and that allegations that Defendants acted "in concert" are required for joinder, (*see* May 26, 2021 Minute Order). It is respectfully submitted that the imposition of such a standard would be incorrect as a matter of law. As detailed below, the Second Circuit standard for determining whether claims are transactionally related requires a court to assess the relationship between the claims and determine whether the complaint's allegations against the various defendants, which much be accepted as true, are so "logically connected" that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit. Joinder does *not* require that a complaint allege that defendants acted in concert with one another or that they conspired with each other on any claims. Nor is it even

---

[3] To the extent the Court believes that the current Complaint (as well as this Response) do not sufficiently detail the role and participation of the various Defendants, Plaintiffs respectfully request the opportunity to – and would commit to – filing an Amended Complaint against the existing Defendants to remedy any shortcomings identified by the Court.

[4] Although Plaintiffs do not believe they should be required to do so, Plaintiffs would not object to the Court issuing an Order – as in *Bilyk* -- directing them to pay a filing fee with respect to all twenty-seven Retail Enterprises named in the Complaint. if such an Order would alleviate any concern that the avoidance of filing fees motivated Plaintiffs to file the Complaint in its current form.

required that a complaint contain allegations that defendants are jointly and severally liable with respect to any claims for relief. Binding precedent encourages joinder, as well as a view of complaints in the broadest possible manner to meet that end.  The bottom line here is that all that is required is the logical connectivity of the claims, which is more than present in the Complaint before the Court. It is thus respectfully submitted that joinder here was and is appropriate.

As further detailed below, the Complaint herein alleges with specificity how each of the DME companies (collectively referred to in the Complaint and herein as "Retailers") named, through their respective owners, engaged in fraudulent billing practices that are so fundamentally identical that they make joinder not only a legal right, but a practical necessity. Aside from alleging that each of the Retailers (through their respective owners) paid kickbacks to No-fault Clinics in exchange for prescriptions, obtained fraudulently inflated wholesale invoices to substantiate bogus claims for reimbursement and billed for the provision of a substantially similar battery of DME and/or orthotic devices to virtually every Claimant, the Complaint also provides clear allegations of interrelatedness that manifestly warrant the Defendants being kept together in a single action. For example, within the body of the Complaint, it is alleged that at least half of the Retailers submitted prescriptions to Plaintiffs bearing the *same identical photocopied or duplicated health care provider signatures*, evidencing a common source, blueprint, mechanism, and plan.[5] The Complaint further alleges many instances when a dozen or more Retailers utilized the *exact same phantom billing codes* which did not even exist in the applicable fee schedule in billing documents submitted to Plaintiffs. Moreover, Plaintiffs identified, in the Complaint, instance after instance where many Retailers billed Allstate pursuant to the *same specific HCPCS Codes* while purportedly providing Claimants with cheap and inferior products that failed to meet the codes'

---

[5] Indeed, the DME prescriptions, in numerous instances, come from one or more of the same eight fraudulent "medical mill" multidisciplinary clinics.

definitions, or that Retailers billed Allstate for rental DME items which were unnecessary and were billed in excess of the same applicable Fee Schedule. These similarities are no coincidence – they reflect and demonstrate that these schemes are logically and transactionally related in that they show the existence of a common fraudulent scheme implementation blueprint developed and used by these various defendant groupings. Given that Rule 20 permits the joinder of defendants provided that they are logically connected, it is respectfully submitted that joinder here was and is proper.

In addition, as specified in more detail below, the common protocol raises common issues of fact and law, which abound here. Indeed, at the core of this matter are the same factual issues regarding the nature and quality of identical items of durable equipment, and whether the Retailers provided that equipment pursuant to the same fraudulent protocol. There are also factual issues surrounding the use, by many Retailers, of the same photocopied health care provider signatures on prescriptions and of the same phantom HCPCS Codes. These factual commonalities cannot be overlooked and militate strongly in favor of joinder. In addition to those facts, there are also identical legal issues concerning the interpretation of the New York No-fault Fee Schedule with respect to the HCPCS Codes which were universally used across Retailers, and whether the same types of equipment purportedly provided by the Retailers meet the Fee Schedule's definitions for those the HCPCS Codes.

The refiling of this matter against "each group of defendants who are alleged to have worked in concert" as the Court suggests as an alternative to this Complaint (*see* May 26, 2021 Minute Order), would not only hold Plaintiffs to a joinder standard which is inconsistent with Second Circuit precedent, but would result in the filing of twenty-seven (27) separate Complaints against defendants who all implemented a common fraudulent blueprint which involved the use,

in many instances, of the same HCPCS Codes, same bogus equipment, same referring providers and same boilerplate documentation, and which evidences a scheme traceable back to a common genesis and framework. Given the foregoing interconnectivity of the claims against Defendants, causing Plaintiffs to essentially "copy and paste" the same allegations dozens of times into dozens of separate matters to potentially be brought before dozens of different sets of District and Magistrate Judges, all to answer the same fundamental questions concerning fraudulent billing for DME, which will primarily involve much of the same evidence, witnesses and discovery issues and motion practice, would conflict with Rule 20's mandate and desire to promote uniformity and efficiency in the administration of justice.   This Court previously recognized in *Bilyk* that duplicative proceedings based on the same evidence should be avoided. *See Bilyk*, 2021 WL 216673 at *5-6 ("severance would require the filing of five separate actions supported by the same evidence…[and] would result in logistical hurdles and ultimately waste judicial resources").

For example, if Plaintiffs were required to file an action against each Retailer and its owner, the Court would potentially be faced with twenty-seven initial conferences (as well as twenty-seven status conferences in each matter as needed), twenty-seven discovery orders, and motion practice on twenty-seven cases on the same substantive issues relating to fact discovery, expert discovery, pre-trial motions, summary judgment and default judgment, to name just a few of the types of substantially similar motions that would be filed and heard by different judges within the Eastern District. Moreover, the risk of disparate and inconsistent rulings from the many judges assigned to these twenty-seven different cases similarly militates against dismissal on improper joinder grounds. The Court would also be faced with the prospect of twenty-seven expert reports on the same issues regarding the same HCPCS Codes; twenty-seven depositions of Plaintiffs and other fact witnesses on the same issues such as claim procedures; and twenty-seven discovery

motions on the same issues concerning the source of DME, amounts charged, medical necessity of items and referral sources and relationships with the medical providers issuing the prescriptions for the DME. Such a result would thwart efficiency, not promote it, as it would unnecessarily clog this Court and burden its Judges with a stream of unnecessary matters.   This undesirable circumstance is distinctly avoidable through the litigation of these claims efficiently in one action. These efficiencies are not abstract; they have been demonstrated time and again in similar matters, all of which have been brought to successful resolutions.

In addition, at this juncture of the litigation, where there has been no pretrial discovery or fact-finding, the Court is required to accept the common and similar allegations made by the Plaintiffs in their Complaint as true and provable. While severance could be addressed more appropriately later on in the matter, such as at trial, keeping the Defendants together at least for the purposes of discovery at this time is manifestly more efficient than facing the risk of having the same discovery propounded in a multitude of nearly identical lawsuits involving the same core issues. In addition, if history is a guide, multiple Defendants, if not many, will likely be represented by the same defense counsel, further promoting efficiencies and not requiring those counsel, or Plaintiffs, to make dozens of appearances before different judges. Moreover, since there is no prejudice to Defendants in keeping this matter intact, it is respectfully submitted that the Court should, at a minimum, allow discovery to proceed and, to the extent necessary, at the conclusion of discovery, then entertain severance motions at the trial stage should prejudice arise. Since the Federal Rules of Civil Procedure give the courts broad discretion to allow parties to be joined as defendants if the essential facts of the various claims are logically connected so that the considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit, it is also respectfully submitted that joinder in this matter is appropriate.

## ARGUMENT

## I.

## THE COMPLAINT'S CLAIMS FOR RELIEF ARE LOGICALLY CONNECTED

Plaintiffs respectfully submit that that the Complaint's claims for relief are "logically connected" because they demonstrate identical action on the part of the Defendants and share common questions of law and fact. Indeed, the Complaint, coupled with this Response, set forth in abundant detail how the various Defendant enterprises shared common fraudulent billing hallmarks which clearly evidence a logical relationship to one another.

### 1. **Legal Standard**

Federal Rule of Civil Procedure 20(a)(2) provides that defendants may be joined in one action if any right to relief is asserted against them with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences, and if any question of law or fact common to all defendants will arise in the action. While there is no rigid rule as to what constitutes the same transaction or occurrence for purposes of joinder under Rule 20(a), *see City of New York v Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 549 (E.DN.Y. 1987), courts within this Circuit have repeatedly interpreted the phrase "same transaction or occurrence" as used in Rule 20 to include all logically related claims asserted against different parties. *See, e.g., Blesedell v. Mobil Oil Co.*, 708 F. Supp. 1408, 1421 (S.D.N.Y. 1989); *see also Fong v. Rego Park Nursing Home*, 95-CV-4445 (SJ), 1996 WL 468660 (E.D.N.Y. Aug. 7, 1996) (holding that the terms "transaction" and "occurrence" in Rule 20 permit all logically related claims by or against different parties in a single proceeding).[6] In construing the term "transaction or occurrence" under Rule 20, courts in this

---

[6] Federal courts in other Circuits are in accord. *See, e.g., Saval v. BL Ltd.*, 710 F.2d 1027, 1031 (4th Cir.1983) (finding that Rule 20 permits all reasonably related claims for relief by or against different parties to be tried in a single proceeding; absolute identity of all events is unnecessary) (citations omitted); *Mosley v. General Motors Corp.*, 497

Circuit have drawn guidance from the use of the same term in Rule 13(a), applying to compulsory counterclaims. *See, e.g.*, *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974). As the Second Circuit has observed in the Rule 13 context, to determine whether a counterclaim arises out of the same transaction as the original claim, the court must assess the logical relationship between the claims and determine whether the essential facts of the various claims are so "logically connected" that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit. *United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir.1979) (internal quotation omitted).

Furthermore, the Court must undertake its analysis on a case-by-case basis, bearing in mind that it should employ a broad view of the Complaint in order to promote judicial economy and to allow all related claims to be tried within a single proceeding. *See, e.g.*, *Liegey v. Ellen Figg, Inc.*, 02-CV-1492 (JSM) (JCF), 2003 WL 21361724, at *3 (S.D.N.Y. June 11, 2003) (explaining that the requirements of Rule 20(a) should be interpreted liberally); *Blesedell*, 708 F. Supp. at 1421 (finding that the purpose of Rule 20 is to promote trial convenience and to expedite the resolution of disputes, thereby preventing multiple lawsuits). Importantly, the United States Supreme Court has stated that, under the Federal Rules, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties," and therefore, "joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966). *See also Sonn v. Wal–Mart Stores, Inc.*, 06-CV-1816 (FB) (JO), 2006 WL 2546545, at *2 (S.D.N.Y. Sept. 1, 2006) (noting that the Court has broad discretion in deciding whether to permit joinder (citing *Briarpatch Ltd., L..P. v. Pate*, 81 F. Supp. 2d 509, 515 (S.D.N.Y. 2000)).

---

F.2d 1330, 1333 (8th Cir. 1974) (finding that "transaction" is a word of flexible meaning that may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship" (citations omitted)).

Moreover, in light of the broad discretion afforded to district courts pursuant to Rule 20, "[f]ederal courts view severance as a procedural device to be employed only in exceptional circumstances." *See Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008). Finally, at this juncture of the litigation, where discovery has not yet taken place, the Court, when considering severance, is required to accept Plaintiffs' allegations and assume that they are "true and provable." *See Viada v. Osaka Health Spa, Inc.*, 235 F.R.D. 55, 61 (S.D.N.Y. 2006). Applying the foregoing standards of law to the facts here, it is respectfully submitted that Defendants are properly joined and, consequently, the Complaint should not be dismissed or severed based on the grounds of improper joinder.

## 2. <u>The Complaint's Claims For Relief Are Logically Connected</u>

The Complaint's claims for relief are logically related and share common questions of law and fact. First, the Complaint sets forth in abundant detail how the fraudulent billing methods used by the various DME Retail enterprises shared common fraudulent hallmarks which evidence a logical relationship to one another. For example, the Complaint alleges how each of the Retailers, through their respective Retail Owners, engaged in virtually identical and parallel schemes to defraud, wherein the Retail Owners: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) obtained fraudulently inflated wholesale invoices from the wholesalers that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits and/or purchased counterfeit DME and/or orthotic devices from non-party wholesalers; (v) arranged for the No-fault Clinics to have assignments of

benefits and acknowledgement of delivery receipt forms signed by Claimants on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (vi) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that were purportedly provided to Claimants based on medical necessity when, in fact, the Retail Owners, through their respective Retailers, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Claimant receiving a substantially similar battery of DME and/or orthotic devices.  Compl. ¶ 149.

The Complaint goes on to allege that each DME enterprise carried out its scheme to defraud though substantially similar means, using fundamentally identical schemes to fraudulently bill Plaintiffs, for expensive DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs. Compl. ¶ 151. In furtherance of their schemes, regardless of whether a No-fault Claimant was seen by a doctor on the date of the initial office visit at No-fault Clinics, a No-fault Claimant's initial office consultation would automatically trigger a series of internal practices and procedures in which No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary. Compl. ¶ 152 These prescriptions were issued for virtually every No-fault Claimant, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in

an accident.  Compl. ¶ 153. In addition, as part of the scheme, pursuant to kickbacks or other financial compensation agreements with the Retailers, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to the Retailers by: (i) causing their Health Care Practitioners ("HCPs") to write DME prescriptions in accordance with a pre-determined protocol; (ii) fabricating and/or falsifying DME prescriptions by photocopying or duplicating the HCPs' signatures onto new, blank prescription forms, or altering the prescriptions, and filling in the prescription with expensive and unnecessary DME and/or orthotic devices; and/or (iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone. Compl. ¶ 154.

It is further alleged how multiple Retailers submitted prescriptions to Plaintiffs bearing the *same* identical HCP signatures, further evidencing a common source, blueprint, mechanism, and plan. Compl. ¶ 154. By way of example and not limitation, Exhibit 8 to the Complaint contains a representative sample of prescription forms submitted by Retailer Defendants Accelerated DME Recovery, All Best Trading, Allbody Healing, ALP Supply, ATB Services, Bodybloom Services, Caresoft Leasing, Cavallaro Medical Supply, Flawless Quality Care Services, Medical Supply of NY, MedMart of NY, Multimed Supply, Quality Med Equip, Quality Medical & Surgical Supplies in support of claims for reimbursement to Plaintiffs, wherein the HCP signatures on the prescriptions appear to be duplicated and/or photocopied. Compl. ¶ 154 and Ex. 8.

While the foregoing allegations would be enough to make joinder appropriate, the Complaint goes on to set forth in great detail the many overlapping factual similarities between the Retailers' schemes that make joinder proper. Not only do these similarities establish the logical

connection of he claims, but they show the common issues that would form the basis for common

discovery in this case. By way of example and not limitation:

- Eighteen Retailers (Accelerated DME Recovery, Aero Medical Supply, All Best Trading, ALP Supply, ATB Services Inc., Bodybloom Services, Cavallaro Medical Supply, Data Insight Lab, Med Mart of NY, Medical Supply Depot Group, Medical Supply of NY Corp, Mom and Dad Orthopedics Supplies, QBS Solutions, Quality Med Equip, Quality Medical & Surgical Supplies, Royal Rehab, Sabas NY Services, and Supportive Products) billed Allstate for  lumbar sacral orthosis (back braces) requiring customization under one or more of the same six billing codes, notwithstanding that to extent anything was provided at all, provided LSOs were no more than cheap, pre-fabricated, one-size-fits-all LSOs, billed under Fee Schedule Codes requiring that the LSO provided be either custom fabricated for the Claimant, or requiring that the Claimant receive a custom fitting. S*ee* Compl. ¶¶ 227-234 and Ex. 26.

- Seventeen Retailers (Accelerated DME Recovery, Aero Medical Supply, ALP Supply, ATB Services, Bodybloom, Cavallaro Medical Supply, Data Insight Lab, MedMart of NY, Medical Supply Depot Group, Medical Supply of NY, Mom and Dad Orthopedics Supplies, QBS Solutions, Quality Med Equip, Quality Medical & Surgical Supplies, Royal Rehab, Sabas NY Services, and Supportive Products) billed Allstate for cervical traction units under Fee Schedule Code E0855, notwithstanding that to the extent anything was provided, it was inexpensive replicas or knockoffs of trademarked cervical traction units with a wholesale price that is a fraction of the cost associated with the authentic device. S*ee* Compl. ¶¶ 249-251 and Ex. 25.

- Sixteen Retailers (Accelerated DME Recovery, Aero Medical Supply, All Best Trading, ALP Supply, Cavallaro Medical Supply, Data Insight Lab, Med Mart of NY, Medical Supply Depot Group, Medical Supply of NY, Mom and Dad Orthopedics Supplies, QBS Solutions, Quality Med Equip, Quality Medical & Surgical Supplies, Sabas NY Services, Supportive Products, and Trinity Bracing) billed Allstate for custom fabricated knee braces under one or more of the same three billing codes, notwithstanding that to the extent anything was provided, it was cheap, one-size-fits-all knee braces, billed under Fee Schedule Codes reserved for complex knee braces custom fabricated for the Claimant. S*ee* Compl. ¶¶ 235-237 and Ex. 28.

- Twelve Retailers (Aero Medical Supply, All Best Trading, ALP Supply, Cavallaro Medical Supply, Data Insight Lab, Medical Supply Depot Group, Medical Supply of NY, Mom and Dad Orthopedics Supplies Inc, QBS Solutions, Quality Medical & Surgical Supplies, Sabas NY Services, and Supportive Products) billed Allstate for egg crate mattresses under one or more of the same two billing codes reserved for Foam Rubber Mattresses, or Dry Pressure Mattresses, when, to the extent anything was provided at all, it was a thin foam mattress pad, reimbursable, if at all, as a Non-Fee schedule item with a usual and customary price of no more than $25. S*ee* Compl. p. 58, ¶¶ 201-204, Ex. 21.

- Twelve Retailers (Accelerated DME Recovery, Aero Medical Supply, ALP Supply, ATB Services, Cavallaro Medical Supply, Data Insight Lab, Medical Supply Depot Group, Medical Supply of NY, Mom and Dad Orthopedics Supplies, Quality Med Equip, Sabas NY Services, and Supportive Products) billed for TENS and/or EMS Units, either under the same phantom codes not on the fee schedule or Fee Schedule codes reserved for complex TENS devices when, to the extent anything was provided at all, it was cheap digital therapy machines and/or TENS/EMS units, reimbursable, if at all, as Non-Fee Schedule items with a usual and customary price of no more than $30. Compl. ¶¶ 194, 213-217 and Exs. 14 & 24.

- Eleven Retailers (Aero Medical Supply, All Best Trading, ALP Supply Inc, Cavallaro Medical Supply, Medical Supply Depot Group, Medical Supply of NY, Mom and Dad Orthopedics Supplies, QBS Solutions, Quality Med Equip, Sabas NY Services, and Trinity Bracing) billed Allstate for custom fitted knee braces under one or more of the same three billing codes, when to the extent anything was provided at all, it was cheap, one-size-fits-all knee braces, without providing a custom fitting, and billed under Fee Schedule codes requiring a custom fitting. *See* Compl. ¶¶ 235-237 and Ex. 28.

- Ten Retailers (Aero Medical Supply, All Best Trading, ALP Supply, Cavallaro Medical Supply, Data Insight Lab, Medical Supply Depot Group, Medical Supply of NY, Quality Medical Equip, Sabas NY Services, and Supportive Products) billed Allstate for lumbar cushions using Fee Schedule Codes reserved for Wheel Chair Back cushions and/or other wheelchair accessories, in amounts at minimum in excess of $46.00, and often into the hundreds of dollars, but to the extent anything was provided at all, it was a simple back cushion for use in any chair, that would otherwise be reimbursable under the Fee Schedule for $22.04. *See* Compl. ¶¶ 257-261 and Ex. 35.

- Ten Retailers (Aero Medical Supply, ALP Supply, ATB Services, Cavallaro Medical Supply, Data Insight Lab, Medical Supply Depot Group, Medical Supply of NY, QBS Solutions, Quality Medical & Surgical Supplies, and Supportive Products) billed Allstate for orthopedic car seats either under miscellaneous code E1399, or a Fee Schedule Code reserved for a positioning seat for persons with special orthopedic needs, in excess of $84.00, and often for well over $100, when to the extent anything was provided at all, it was no more than inexpensive, cheap bubble pads, reimbursable, if at all, as a Non-Fee Schedule item at a usual and customary price of no more than $20. *See* Compl. ¶¶ 200, 209 and Exs. 20 & 23.

- Nine Retailers (Aero Medical Supply, ALP Supply, Cavallaro Medical Supply, Data Insight Lab, Medical Supply Depot Group, Medical Supply of NY, Quality Medical & Surgical Supplies, Sabas NY Services, and Supportive Products) billed Allstate for bed boards using either Phantom Codes or the same Fee Schedule Code reserved for Overbed Tables in excess of $90.00, when to the extent anything was provided at all, it was an inexpensive, thin piece of foldable cardboard or other material,

reimbursable, if at all, as a Non-Fee Schedule item with a usual and customary price of no more than $30.00. S*ee* Compl. ¶¶ 200, 205-208 and Exs. 16 & 22.

- Nine Retailers (Aero Medical Supply, ATB Services, Cavallaro Medical Supply, Medical Supply Depot Group, Medical Supply of NY Corp, QBS Solutions, Quality Medical & Surgical Supplies, Sabas NY Services and Supportive Products) billed Allstate for massagers under miscellaneous code E1399, in amounts in excess of $139.50, when to the extent anything was provided at all, it was simple hand-held massagers, reimbursable, if at all,  at a usual and customary price is no more than $30. S*ee* Compl. ¶¶ 199and, Ex. 18.

- Nine Retailers (All Best Trading, ATB Services, Bodybloom Services, Cavallaro Medical Supply, Data Insight Lab, Mom and Dad Orthopedics Supplies, QBS Solutions, Sabas NY Services, and Supportive Products) billed Allstate for cervical collars under Fee Schedule codes reserved for complex cervical collars in amounts in excess of $130.00, when to the extent anything was provided at all, it was simple foam and/or semi-ridged collars that would otherwise be reimbursable under the Fee Schedule for $75.00 or less. *See*  Compl. ¶ 252-256 and Ex. 34.

- Nine Retailers (ALP Supply, Cavallaro Medical Supply, Data Insight Lab, Medical Supply Depot Group, Medical Supply of NY, Mom and Dad Orthopedics Supplies, Quality Medical & Surgical Supplies, Sabas NY Services, and Supportive Products) billed Allstate for hydrotherapy whirlpools under the same two phantom Codes or code E1399, in amounts in excess of $270.00, when to the extent anything was provided at all, it was inexpensive "jet spas," reimbursable, if at all, at a usual and customary price of no more than $40.00. *See*  Compl. ¶¶192, 200 and Exs. 4, 12 & 19.

- Nine Retailers (Aero Medical Supply, ALP Supply, Cavallaro Medical Supply, Data Insight Lab, Medical Supply Depot Group, Medical Supply of NY, Mom and Dad Orthopedics Supplies, Sabas NY Services, Supportive Products) billed Allstate for infrared lamps under Phantom Codes, in amounts in excess of $150.00, but to the extent anything was provided at all, it was cheap, handheld infrared lamps, reimbursable, if at all, at a usual and customary price of no more than $20.00. *See* Compl. ¶190 and Ex. 4 & 11.

- Nine Retailers (ALP Supply, ATB Services, Cavallaro Medical Supply, Data Insight Lab, Medical Supply Depot Group, Medical Supply of NY, QBS Solutions, Quality Med Equip, Sabas NY Services, and Supportive Products) billed for Allstate for custom fabricated shoulder supports under one or more of the same Fee Schedule Codes which require that the shoulder support be either custom fabricated for the Claimant, that the Claimant receive a custom fitting, when to the extent anything was provided at all, it was simple and often, cheap, one-size-fits-all shoulder supports without customization. S*ee* Compl. ¶¶ 238-243 and Exs. 29-30.

- Seven Retailers  (ALP Supply, Cavallaro Medical Supply, Data Insight Lab, Medical Supply Depot Group, Medical Supply of NY, Sabas NY Services, and Supportive Products) billed Allstate for water circulation heat pads with pump under Phantom Code E0217, in excess of $280,00, but to the extent anything was provided at all, it was cheap aqua relief systems, reimbursable, if at all, at a usual and customary price is no more than $200. *See* Compl. ¶ 200. and Ex. 13.

- Seven Rental Retailers[7] (Accelerated DME Recovery, Allbody Healing Supplies, Caresoft Leasing, and Multimed Supply) routinely billed for continuous passive motion devices for the knee at inflated daily rental rates in excess of $49.99, misrepresenting that the inexpensive devices dispensed to Claimants are high-quality and expensive units, for medically unnecessary durations of time, resulting in total charges in excess of $1,400.00 per patient under the same code, E0936. *See* Compl. ¶¶ 276-278 and Ex. 36.

- Four Rental Retailers (Accelerated DME Recovery, Allbody Healing Supplies, Caresoft Leasing, and Multimed Supply) routinely billed for continuous passive motion devices for the joints other than the knee at daily rental rates in excess of $59.00, misrepresenting that the inexpensive devices dispensed to Claimants are high-quality and expensive units, for medically unnecessary durations of time,  resulting in total charges in excess of $1,162.00 per patient under the same code, E0935. *See* Compl. ¶¶ 276-277, 279 and Ex. 36.

- 5 Rental Retailers (All Best Trading, Bodybloom Services, Nu Age Med Solutions, Reliable Therapy Equipment, and RGN Group) routinely billed for the rental Sustained Acoustic Medicine brand devices—portable and wearable ultrasound device—on patients who recently underwent outpatient arthroscopic surgeries, despite such devices being insufficiently strong to produce clinically effective heating, at daily rental rates at or over $58.00, for medically unnecessary periods of time, often unbinding charges into 14, 21, or 28 day periods to disguise the total amount of the charge, totaling up to and including $4,407.90. *See* Compl. ¶¶ 313-324 and Ex. 39.

---

[7] The Rental Retailers include Accelerated DME Recovery, All Best Trading, Allbody Healing Supplies, Bodybloom Services, Caresoft Leasing, Flawless Quality Care Services, Multimed Supply, Nu Age Med Solutions, Reliable Therapy Equipment, RGN Group, Strac Medical, and Trinity Bracing.  As noted in the Complaint, in each instance, in furtherance of common fraudulent scheme engaged in by the Retailers, the Retailers that purportedly supply expensive rental DME do so after a standard battery of anywhere between 10 and 12 items of non-rented DME has been billed to Plaintiffs. Indeed, the Claimants receiving the expensive rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Claimants undergo a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture and the several pieces of non-rented DME and/or orthotic devices. To further maximize reimbursement, the Claimants are later prescribed expensive rental DME and/or compression devices, as part of a pattern and protocol of treatment for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration with the medical mills.  In nearly all cases, the rented DME is prescribed by the same clinic that prescribed the non-rented DME at the prior point in the scheme.

The Complaint's common allegations not only show the Defendants' logical connections. but are also material to the issue of the liability of all Defendants, and, taken together, these allegations satisfy Fed. R. Civ. P. 20's requirement of sharing common questions of law and fact. The analogous matter of *Allstate Ins. Co., et al. v. Khaimov et. al*, 11-CV-2391 (JG) (JMA) (E.D.N.Y.), is instructive. In *Khaimov*, plaintiff-insurers filed RICO and common law fraud claims against thirty-seven (37) defendants alleging, among other things, that the owners of numerous DME retail supply companies participated in the mechanics and execution of massive parallel schemes to defraud in which they, through DME retailer enterprises that they owned and controlled, adopted the same fraudulent blueprint and mailed hundreds of fraudulent insurance claims for DME to Plaintiffs for reimbursement pursuant to No-fault Law.  Furthermore, each of the defendant DME retailers (*i.e*., the ones who submitted that actual bills to Allstate) were ostensibly independent entities, as is the case here, that submitted the same types of boilerplate bills and supporting documentation to plaintiffs containing the same types of fraudulent misrepresentations purportedly justifying their respective claims. *Khaimov*, 11-CV-2391, ECF No. 10 (Compl.) ¶¶ 2, 63-67, 69, 72, 169-71, 173, 177, 179, 182-83 256-57, 293-316, 330-343, 345-358, 359-368, 382-393, 412-435, and 501-524. and Exs. 3, 6-8, 11-16 and 18-19.[8] Importantly, the complaint *did not* allege that the Retail Owners acted in concert with one another; it *did not* allege that they were jointly and severally liable on any claims; and it *did not* allege that they conspired with one another with respect to any of the complaint's claims for relief. *See, generally, id.*  In connection with a motion to sever, Judge Gleeson held that the defendants were properly joined because, among other things, the "complex schemes [ ] alleged [were] generally identical, [thus,] they're clearly logically related" and that there would be "nothing but efficiency in keeping the

---

[8] *See* Amended Complaint, *Allstate Ins. Co. v, Khaimov*, 11-CV-2391 (MKB)(JMA), ECF No. 10 (Aug. 3, 2011).

claims together in one case." *See* Hr'g. Tr. at 49:19-21, 50:2-3, *Allstate Ins. Co., et al. v. Khaimov et. al*, 11-CV-2391 (JG) (JMA) (E.D.N.Y. Feb. 16, 2012), annexed to the Marvin Decl. as Exhibit "A." In rendering his decision, Judge Gleeson relied on *United Mine Workers*, *supra* at 4, reiterating that under the Federal Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties, and therefore, joinder of claims, parties and remedies is strongly encouraged. *Id* at 49:8-13.[9] The result should be no different here. Both *Khaimov* and the matter at bar involve separate DME providers that engaged in separate, but virtually identical, schemes to defraud in which they purportedly provided medical services to claimants and submitted the same types of boilerplate, fraudulent documents to plaintiff-insurers in connection with claims for reimbursement using the same billing codes. In each case, although there were no specific allegations of concerted action, conspiracy or joint and several liability, both complaints allege that the defendants engaged in near identical parallel schemes to defraud and adopted a fraudulent business model, using it to participate in a systematic pattern of racketeering activity (*compare* Compl. ¶¶ 20-21, 26, 51, 147-149 *with Khaimov*, 11-CV-2391, ECF No. 10 ¶¶ 17, 36, 124-126).

## II.

## JOINDER IS APPROPRIATE IN THE INTERESTS OF JUDICIAL ECONOMY

Since the claims against all of the Defendants are logically related, joinder is appropriate in the interest of judicial economy. If the Complaint is dismissed in lieu of twenty-seven separate actions, the end result would be dozens of separate, but largely identical, actions taking place before potentially dozens of different sets of District and Magistrate Judges, with all of those

---

[9] Judge Gleeson left open the possibility that severance could be addressed at a later time (such as for trial) and noted that there would be nothing but efficiency in keeping the Defendants together for the purposes of discovery. *See* Marvin Decl., Exh. "A," February 16, 2012, Hr'g Tr.at 49-50. Such is precisely Plaintiffs' point here.

matters having virtually the same factual circumstances, discovery issues and legal arguments. Discovery and related motion practice would be unnecessarily duplicative throughout many courts in this District. Undoubtedly, counsel in those dozens of matters would seek to depose many of the same witnesses, retain and seek discovery from the same experts, serve the same types of discovery requests, and bring the same legal issues before the Court in all of them. Similarly, although directed at different Defendants, Plaintiffs' discovery will be substantially similar, seeking the same information about the Defendants' DME—the sources, its cost, the codes billed and amounts charged, the referring provider relationships and the Defendants' finances, among other things—implicating duplicative resolution of the same discovery issues, if required. Clearly, the interests of judicial economy and efficiency, coupled with the predominant common issues of law and fact demonstrate that the Defendants were properly joined in this action.  In *Bilyk,* this Court noted the inherent inefficiencies, "logistical hurdles" and "waste of judicial resources" in requiring severance of the remaining defendants into "five separate actions supported by the same evidence." *Bilyk,* 2021 WL 216673 at *5-6.  That rationale is even more applicable here when the number of potential separate actions in which duplicative discovery and motion practice will be generated is significantly greater.

## III.

## SEVERENCE SHOULD NOT BE IMPOSED AT THIS EARLY STAGE OF THE LITIGATION

As detailed above, the Complaint's allegations set forth how the Defendants participated in parallel schemes to defraud in which fraudulent No-fault insurance claims containing specific types of billing fraud relating to DME and/orthotic devices were submitted to Plaintiffs for reimbursement pursuant to the No-fault Law. As a result, it is respectfully submitted that the Defendants have been properly joined. Importantly, "at this juncture in the litigation, where…no

facts [have been] developed during the pretrial discovery phase . . . , the Court is required to accept the allegations made by the plaintiffs in their complaint and assume that all matters alleged . . . in the complaint are true and provable." *Viada v. Osaka Health Spa, Inc.*, 235 F.R.D. 55, 61 (S.D.N.Y. 2006) (accepting the complaint's allegations as true, finding that common questions of fact exist and denying a motion to sever).

Accordingly, it is respectfully submitted that at this early state of the litigation, there is no reasonable basis to require Plaintiffs to file separate matters. As Judge Gleeson recognized in *Khaimov*, severance could be addressed more appropriately later on in the matter, such as at trial, which would maintain the efficiency of keeping the Defendants together for the purposes of discovery. Given the logical connectivity amongst the Defendants, such an approach would promote judicial economy by avoiding the hazard of having the same discovery propounded in a multitude of nearly identical lawsuits only to realize, many months later, that the cases were properly joined in the first instance.

The court in *Lyons v. Litton Loan Servicing LP*, 13-CV-513 (ALC) (GWG), 2014 WL 5039458, at *1 (S.D.N.Y. Sept. 29, 2014), took a similar approach when faced with disputed facts as to joinder early in the litigation. There, the defendants moved to sever because the plaintiffs had asserted claims that involved separate loan transactions by different lenders. *Id.* at *3. The court denied the defendants' motion (without prejudice to renew), at least until common factual and legal issues could be fleshed out appropriately. As relevant here, the *Lyons* court found that the essential facts of plaintiffs' claims may have been logically related through a particular group of defendants. *Id.* Noting that "some of the grounds offered for severance were factually unclear," the court determined that there were enough "common questions about [one group of defendants']

20

liability and connection to the actions of [the other groups of defendants] that merit[ed] denying severance for now." *Id.* Such is the case here.

Finally, there will be no prejudice to Defendants by allowing discovery to proceed and addressing severance, to the extent necessary, at a later date, if and when a legitimate claim of prejudice arises. *See Beth Israel Medical Ctr. v. Goodman*, 12-CV-1689 (AJN), 2013 WL 1248622, at *5 (S.D.N.Y. Mar. 26, 2013) (denying motion to sever in early stage of litigation because defendant had "identified no prejudice that would be suffered by proceeding at least through discovery on a common case management schedule"). Accordingly, the Court should, at a minimum, allow discovery to proceed and, to the extent necessary, address any severance claims, if necessary, at a point later on in the litigation. Doing so now will merely create unwanted inefficiencies.

## <u>CONCLUSION</u>

For the reasons set forth herein, it is respectfully submitted that the Defendants in the Complaint are properly joined and, at minimum, the Complaint should be permitted to proceed in its current form through discovery.

21

Dated: New York, New York
       June 2, 2021

                              Respectfully submitted,

                              MORRISON MAHONEY LLP


                              By: _____/s/ Daniel S. Marvin_____
                                   Robert A. Stern, Esq.
                                   Daniel S. Marvin, Esq.
                                   James A. McKenney, Esq.
                                   Lee Pinzow, Esq.
                                   Wall Street Plaza,
                                   88 Pine Street, Suite 1900
                                   New York, New York 10005
                                   (212) 825-1212


                              CADWALADER, WICKERSHAM & TAFT LLP


                              By: _____/s/ William Natbony_____
                                   William J. Natbony, Esq.
                                   One World Financial Center
                                   New York, New York 10281
                                   (212) 504-6531

                              *Attorneys for Allstate Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property & Casualty Insurance Company*